IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

JOEL ORTEGA SANTOYO,           §
TDCJ-CID NO.696270,            §
Plaintiff,                     §
                               §          CIVIL ACTION NO. G-06-0555
                               §
TODD BOUTON, *et al.,*         §
Defendants.                    §

OPINION ON DISMISSAL

Plaintiff Joel Ortega Santoyo, a non-English speaking state inmate proceeding *pro se* and *in forma pauperis*, has filed a civil rights complaint pursuant to 42 U.S.C. § 1983. (Docket Entries No.1, No.13, No.14). Plaintiff alleges that medical staff at the Stringfellow Unit of the Texas Department of Criminal Justice-Correctional Institutions Division ("TDCJ-CID") and at the University of Texas Medical Branch ("UTMB") delayed treatment for his injured shoulder and that TDCJ staff forced him to perform job assignments in violation of his work restrictions. (Docket Entries No.1, No.14). Defendants have filed a motion to dismiss on Eleventh Amendment grounds and a motion for summary judgment. (Docket Entries No.49, No.51). Plaintiff has filed a response to the summary judgment motion. (Docket Entry No.52). For the reasons to follow, the Court will grant defendants' summary judgment motion and deny plaintiff relief.

I. BACKGROUND

Plaintiff is serving a forty-year sentence on a 1994 aggravated robbery conviction from Webb County in cause number K-94-00719. TDCJ-CID website.[1] The record reflects the

---

[1] http://168.51.178.33/webapp/TDCJ/InmateDetails.jsp?sidnumber=05395119

following in pertinent part:  In January 2004, a UTMB medical provider on the McConnell Unit of TDCJ-CID diagnosed plaintiff with a left rotator cuff tear.  (Docket Entry No.39-2, page 17).  In late May 2004, plaintiff was admitted to UTMB for arthroscopic surgery.  (Docket Entry No.38-7, pages 15, 17).  The scoping was cancelled due to lack of operating room time and a return appointment was not scheduled.  (*Id*., page 32).  Plaintiff was transferred to other units.  (Docket Entries No.38-7, page 17; No.51-10, page 9).  From December 8, 2005, to March 9, 2006, plaintiff had no work restrictions on his health summary sheet ("HSM-18").  (Docket Entry No.51-7, pages 3-5).  Even so, TDCJ officials did not assign a job to plaintiff during this time.  From April 1, 2004, to February 9, 2006, plaintiff was either medically unassigned, on transient status, or unable to work because of a unit lockdown.  (Docket Entry No.51-10, pages 7-8).

On February 10, 2006, plaintiff was transferred to the Stringfellow Unit, where he was temporarily assigned to an agriculture job.  (*Id*., page 7).  Three days later he was assigned to the hoe squad.  (*Id.*).  On March 9, 2006, plaintiff was examined by P.A. Todd Bouton ("Bouton").  (Docket Entries No.38-5, pages 35-38; No.51-5, pages 6-7).  Through an interpreter, plaintiff complained of pain in his left shoulder and Bouton ordered a shoulder and chest x-ray and prescribed pain medication.  (Docket Entries No.38-5, pages 35-37; No.51-5, page 6).  The x-ray on March 13, 2006, showed no evidence of acute fracture or subluxation.  (Docket Entry No.51-5, page 8).

On April 14, 2006, plaintiff was seen by Bouton regarding his chronic left shoulder pain and numbness in his left hand.  (Docket Entry No.51-5, page 11).  Bouton prescribed more pain medication, warm moist soaks, and stretching exercises.  (*Id*.).  On April 24, 2006, Bouton again examined plaintiff regarding pain in his left shoulder and chest and noted

2

that plaintiff had the same complaint for over a month.  (*Id.*, page 14).  Bouton continued the pain medication and requested an orthopedic consultation.  (*Id.*).  On April 24, 2006, the orthopedic consultation request was denied on utilization review by UTMB Medical Director Dr. Reza Mohammed Jahadi, as not meeting criteria.  (Docket Entries No.38-6, pages 7; 27; No.51-6, page 4).  Bouton examined plaintiff again on May 9, 2006, regarding his left shoulder pain and prescribed more pain medication, warm moist soaks and a 2-day lay-in.  (Docket Entry No.51-5, page 17).

Plaintiff filed Step 1 Grievance No.2006160650 on May 22, 2006, complaining that his shoulder pain did not stem from his bones but his muscles and nerves; he requested to see a specialist at UTMB as Bouton had promised.  (Docket Entry No.51-2, pages 2-6).  Warden Negbenebor responded that the referral to the orthopedic clinic had been denied and plaintiff was scheduled for an appointment with Dr. Dumas.  (*Id.*, page 4).

On May 30, 2006, Dr. Natascha Dumas ("Dumas") examined plaintiff regarding his left should pain.  (Docket Entry No.51-5, page 19).  She noted that plaintiff had injured his shoulder years ago and that in 2004, he was scheduled for shoulder surgery but the surgery was cancelled.  (*Id.*).  She diagnosed plaintiff with a left rotator cuff tear or impingement.  (*Id.*).  She noted that another provider had scheduled a radiology appointment for plaintiff in August, 2006, and that possibly he was scheduled for a MRI.[2]  (*Id.*).  Dumas issued work restrictions of no work above the shoulder, no climbing, no lifting over 20 pounds and a lower bunk restriction.  (*Id.*).  She also ordered a stronger pain medication.  (*Id.*).  On May 31, 2006, plaintiff was assigned to the utility squad 4.  (Docket Entry No.51-10, page 6).  He was temporarily assigned

---

[2] Plaintiff's appointment was for an unrelated medical condition.  (Docket Entry No.38-6, pages 7, 27, 42).

to the agriculture squad on June 2, 2006, and reassigned to the utility squad 4 on June 5, 2006. (*Id.*).

On June 4, 2006, plaintiff filed Step 2 Grievance No.2006160650. (Docket Entry No.51-2, pages 7-9). He complained again about the need for additional medical treatment by a specialist and about being required to do the same job in the hoe squad and the utility squad. (*Id.*). Program Administrator Guy Smith responded that plaintiff had not attempted informal resolution. (*Id.*, page 8).

On June 20, 2006, Bouton examined plaintiff for shoulder pain again. (Docket Entry No.51-5, page 21). Plaintiff requested to see Dr. Dumas. (*Id.*). Bouton continued medications and noted restrictions. (*Id.*). Bouton saw plaintiff again on July 11, 2006, and changed his pain medication. (*Id.*, page 23). Bouton noted that his orthopedic request had been denied. (*Id.*). Another x-ray on July 12, 2006, reflected that plaintiff's left clavicle was within normal limits. (*Id.*, page 25).

On July 17, 2006, plaintiff submitted Step 1 Grievance No.2006197492, complaining that both Bouton and Dumas told him that they did not approve jobs but they would add restrictions. (Docket Entries No.14, pages 13-14; No.14-1, pages 5-6; No.51-2, pages 10-12). Plaintiff complained that when he first came to the Unit, Bouton removed his restrictions because Warden Negbenebor and Classification Chief Dickerson needed workers. (*Id.*). Plaintiff claimed that he wrote to Classification Chief and asked him to reinstate his restrictions of no climbing, no reaching over his shoulder but Dickerson said to keep working. (*Id.*). Plaintiff complained that his shoulder hurt and that he could not lift with his arm and that he experienced a lot of pain when he tried to jump on the trailer, work with the hoe, chop trees,

4

work in the grass, or carry bags of vegetables. (*Id.*). Plaintiff said there were few outside jobs that did not require him to use his arms. (*Id.*).

Warden Negbenebor indicated in his response to Step 1 Grievance No.2006197492 that plaintiff's current HSM-18 dated May 30, 2006, was compatible with his work assignment. (Docket Entries No.14, page 14; No.14-1, page 6; No.51-2, page 11). Negbenebor further indicated that Lt. Thomas Day, the field supervisor, said that those who work in Utility Squad 4 were not required to cut trees or pack vegetables. He further stated that the trailers are equipped with steps for offenders to get on them. (Docket Entries No.14, page 14; No.14-1, page 6; No.51-2, page 11).

In Step 2 Grievance No.2006197492, submitted on July 20, 2006, plaintiff complained that Day stated that the utility squad 4 workers were not forced to work but "at times, we have to work more than what were supposed to work." (Docket Entries No.14-1, page 6; No.51-2, page 15). Plaintiff also complained that Day said the trailer had a step but Day did not note that plaintiff had to place his foot on a pipe and hang by his arms to reach the step and that such movement was against his restriction. He also complained that reaching over his shoulder was against his restrictions and Day did not address whether cutting limbs and grass violated such restrictions and hurt him. (*Id.*). He complained that "they" gave answers in their best interest but did not say that he had to lift the hoe with his hand for forty-five minutes. Plaintiff complained that Dickerson was wrong to place him in the squad against his restrictions. (*Id.*). Assistant Regional Director R. Waldon denied the grievance. (Docket Entry No.51-2, page 14).

On September 18, 2006, Dr. Dumas saw plaintiff regarding left shoulder pain. (Docket Entry No.51-5, page 27). Plaintiff again complained about working in the fields. (*Id.*).

5

Dumas noted that plaintiff had a full range of motion of his shoulder and some tenderness along the left scapula and shoulder muscles. (*Id.*) She also noted that he had been seen by an orthopedist in 2004 and that surgery was not warranted. (*Id.*). Her plan was "no change in work restrictions and no indication for new ortho referral." (*Id.*).

On October 17, 2006, plaintiff filed Step 1 Grievance No.2007028239, in which he indicated that Dr. Dumas told him that she had attempted a referral to the orthopedic clinic at UTMB but Doctors Jahadi and Murray had refused the request. (Docket Entry No.51-2, pages 16-18). J. Mossbarger responded that Dr. Dumas had indicated on September 18, 2006, that no change in work restrictions was required nor was there any indication for a new ortho referral. (*Id.*, page 17).

On October 17, 2006, P.A. Paul Jung ("Jung") examined plaintiff's left shoulder and noted a decreased ability to bring left hand up behind back. (Docket Entry No.51-5, page 28). Jung continued pain medication and ordered plaintiff's medical records from UTMB. (*Id.*). Another x-ray on October 20, 2006, reflected no evidence of fracture or subluxation. (*Id.*, page 29). Jung saw plaintiff again on November 21, 2006, regarding shoulder pain. (*Id.*, page 31).

On November 6, 2006, plaintiff submitted Step 2 Grievance No.2007028239, complaining about the pain in his shoulder and requesting an orthopedic appointment. (Docket Entry No.51-2, pages 19-21). The program administrator denied the grievance on December 7, 2009, noting that plaintiff's medical records had been ordered from UTMB. (*Id.*, page 20).

On December 7, 2006, Jung saw plaintiff for shoulder pain and noted that plaintiff had been scheduled for arthroscopy on May 26, 2004, but scoping had been cancelled due to lack of OR time because of lengthy cases. (Docket Entry No.51-5, page 32). He also noted that plaintiff had no return appointment; he further noted that plaintiff had been referred to the

orthopedic clinic on April 24, 2006, for shoulder pain but the referral had been denied.  (*Id.*).

Jung noted that the referral did not indicate that plaintiff had already been seen by an orthopedist.

(*Id.*).  Jung referred plaintiff to the orthopedic clinic and added a work restriction of no repetitive

use of hands for ninety days.  (*Id.*).  Jung saw plaintiff again on December 13, 2006, regarding

the same.  (*Id.*, page 33).

On February 6, 2007, Jung examined plaintiff again for chronic left shoulder pain

and noted that plaintiff had an orthopedic appointment on February 8, 2007.  (Docket Entry

No.38-3, page 10).  Plaintiff was seen by an orthopedist on February 12, 2007, and arthroscopic

surgery was scheduled following an MRI.  (*Id.*, pages 11-12, 15, 16).  Following such surgery on

March 6, 2007, plaintiff was medically unassigned for two months.  (Docket Entry No.3-4, pages

17-21, 24).  Jung added a restriction of no repetitive use of hands to plaintiff's HSM-18 on

March 12, 2007.  (*Id.*, page 2).  The restriction was marked expired on March 14, 2007.  (*Id.*,

page 4).

Plaintiff returned to the Stringfellow Unit from Hospital Galveston on April 19,

2007, with recommendations that he be medically unassigned.  (*Id.*, page 6).  Plaintiff's HSM-18

dated May 14, 2007, noted work restrictions of no lifting more than 20 pounds, no climbing, and

no reaching over shoulder.  (*Id.*, page 10).  On May 30, 2007, plaintiff was assigned to the

laundry as a folder.  (Docket Entry No.52-2, page 6).  On May 31, 2007, an orthopedist

recommended that plaintiff be given physical therapy at the Jester 3 Unit.  (Docket Entry No.38-

4, page 11).  On June 13, 2007, a no-lifting-more-than-five-pounds restriction was added to his

HSM-18.  (*Id.*, page 15).  On June 20, 2007 plaintiff was given a no-repetitive-use-of-hands

restriction.  (*Id.*, page 17).

On June 21, 2007, plaintiff complained to P.A. Jung that he had been assigned to work in the laundry and that his restrictions were not followed. (*Id.*, page 18). On June 21, 2007, plaintiff was medically unassigned for two weeks. (Docket Entry No.52-2, pages 6-7). On July 3, 2007, plaintiff reported shoulder pain and complained about his work in the laundry. (Docket Entry No.38-4, page 19). Jung classified him as medically unassigned for sixty days. (*Id.*, page 20). On July 11, 2007, the physical therapist requested an expedited transfer to Jester 3 for physical therapy on his left shoulder after observing decreased function, strength, and range of motion. (*Id.*, page 21). On August 1, 2007, plaintiff began a six month program with good results. (*Id.*, pages 24, 29). He returned to the Stringfellow Unit on February 11, 2008. (*Id.*, page 30).

Plaintiff filed his original complaint in Spanish on August 18, 2006, and alleges the following: After a year of complaints about his shoulder, plaintiff was sent to UTMB for surgery. (Docket Entry No.1-1, page 4). The surgery was cancelled but Dr. Herrera gave plaintiff some medical restrictions and pain medication. (*Id.*). Herrera told plaintiff that he was still on the list for the surgery. (*Id.*, page 6). In 2006, when he arrived at the Stringfellow Unit, Warden Negbenebor told plaintiff that plaintiff still had restrictions but that he was going to recommend that Bouton remove the restrictions so that plaintiff could work in the fields. (*Id.*). A few days later, plaintiff was assigned to work in the fields. (*Id.*). Plaintiff told the supervising officer that he had medical restrictions because of his shoulder but the officer checked his records and told plaintiff that the records did not show any restrictions; the officer suggested that plaintiff talk with the doctors at UTMB. (*Id.*).

Plaintiff requested to see Bouton and through an interpreter, told Bouton about his shoulder. (*Id.*). Bouton, however, said nothing was wrong with the shoulder and that there was

nothing in the computer files about it.  (*Id.*).  Plaintiff kept working in the fields, lifting a hoe and picking up sacks of vegetables.  He completed another sick call form when the pain worsened and saw Bouton again.  (*Id.*).  Plaintiff's interpreter told him that Bouton was going to give him some pills for pain and to schedule him for an x-ray.  (*Id.*, page 7).  She also told plaintiff that Bouton was taking away the restriction that plaintiff had when he arrived on the Unit.  (*Id.*).  Plaintiff returned to the fields and kept working in spite of the severe pain.  (*Id.*).  He submitted another sick call form and his interpreter told him that the x-ray showed that he was alright.  (*Id.*).  Plaintiff protested that his muscles and nerves were injured and not his bones.  (*Id.*).  Bouton just gave him more pills and plaintiff continued to work in the fields.  (*Id.*).

Plaintiff continued to submit sick call forms and finally saw Dr. Dumas in May, 2006.  (*Id.*, page 8).  Plaintiff's interpreter told him that Dr. Dumas said he was ill and that she was going to send him to UTMB to be checked again, take him out of the fields, and give him medical restrictions.  (*Id.*).  Plaintiff received a copy of the restrictions and was re-assigned to the utility 4 squad.  (*Id.*).  Although he received fifteen minute breaks, he still carried sacks of vegetables, cut branches off trees, and mowed grass with a hoe.  (*Id.*).  And the pain continued.  (*Id.*).  Plaintiff wrote to Classification Chief Charles Dickerson, who responded that nothing was wrong with plaintiff and to keep working.  (*Id.*).  He also wrote to Joe Butler at UTMB, requesting help in correcting a medical mistake.  (*Id.*).  Butler did not respond and left plaintiff in the fields.  (*Id.*, pages 8-9).  Plaintiff seeks compensatory and punitive damages.  (*Id.*).

In his amended complaint filed January 8, 2007, plaintiff added Dr. Owen Murray, Dr. Reza Mohammed Jahadi, and T. Day as defendants.  (Docket Entry No.14).  Plaintiff complained that Drs. Murray and Jahadi had denied Dr. Dumas's request for an orthopedic referral without an examination or an MRI; therefore, they implied that he did not

have an injury.  (Docket Entry No.14-1, pages 1-2).  He complained that in his response to plaintiff's grievance, Lt. Day had indicated that plaintiff was appropriately placed in the fields and the work required did not violate his restrictions.  (*Id.*).

Defendants move to dismiss plaintiff's claims against them in their official capacities pursuant to the Eleventh Amendment.  (Docket Entries No.46, No.49).  They move for summary judgment on grounds that they are entitled to Eleventh Amendment immunity and qualified immunity.  (Docket Entry No.51).

## II. STANDARD OF REVIEW

To be entitled to summary judgment, the pleadings and summary judgment evidence must show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  The moving party bears the burden of initially pointing out to the court the basis of the motion and identifying the portions of the record demonstrating the absence of a genuine issue for trial.  *Duckett v. City of Cedar Park, Tex.*, 950 F.2d 272, 276 (5th Cir. 1992).  Thereafter, "the burden shifts to the nonmoving party to show with 'significant probative evidence' that there exists a genuine issue of material fact." *Hamilton v. Seque Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000) (quoting *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir. 1994)).  The Court may grant summary judgment on any ground supported by the record, even if the ground is not raised by the movant.  *U.S. v. Houston Pipeline Co.*, 37 F.3d 224, 227 (5th Cir. 1994).

## III. DISCUSSION

The Civil Rights Act of 1866 creates a private right of action for redressing the violation of federal law by those acting under color of state law.  42 U.S.C. § 1983; *Migra*

*v.Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 82 (1984).  Section 1983 is not itself a source of substantive rights but merely provides a method for vindicating federal rights conferred elsewhere.  *Albright v. Oliver*, 510 U.S. 266, 271 (1994).  To prevail on a section 1983 claim, the plaintiff must prove that a person acting under the color of state law deprived him of a right secured by the Constitution or laws of the United States.  *Blessing v. Freestone*, 520 U.S. 329, 340 (1997).  A section 1983 complainant must support his claim with specific facts demonstrating a constitutional deprivation and may not simply rely on conclusory allegations.  *Schultea v. Wood*, 47 F.3d 1427, 1433 (5th Cir. 1995).  Thus for plaintiff to recover, he must show that the defendants deprived him a right guaranteed by the Constitution or the laws of the United States.  *See Daniels v. Williams*, 474 U.S. 327, 329-31 (1986).

## A. Official Capacity Claims

Suits for damages against the state are barred by the Eleventh Amendment.  *Kentucky v. Graham,* 473 U.S. 159, 169 (1985).  Under the Eleventh Amendment, an unconsenting state is immune from suits brought in federal courts by her own citizens as well as by citizens of another state.  *Edelman v. Jordan,* 415 U.S. 651, 663 (1974).  Absent waiver, neither a state nor agencies acting under its control are subject to suit in federal court.  *Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.,* 506 U.S. 139, 144 (1993).  This bar remains in effect when state officials are sued for damages in their official capacity.  *Cory v. White,* 457 U.S. 85, 89 (1982).

All defendants in this case are employees of the State of Texas or state agencies; therefore, plaintiff's claims seeking monetary damages against all defendants in their official capacities are barred by the Eleventh Amendment.  *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (suit not against official but state office); *Oliver v. Scott*, 276 F.3d 736,

742, 742 n. 5 (5th Cir. 2002).  Accordingly, defendants are entitled to summary judgment on this ground.

### B. Individual Capacity Claims

### 1. Personal Involvement

Defendants contend that Drs. Murray and Jahadi and Lt. Butler are entitled to qualified immunity because they were not personally involved in plaintiff's health care.  (Docket Entry No.51, page 14).  Personal involvement is an essential element of a civil rights cause of action, meaning there must be an affirmative link between the injury and the defendant's conduct.  *Thompson v. Steele*, 709 F.2d 381 (5th Cir. 1983).

Plaintiff claims that he was informed that Dr. Murray refused to see him.  Dr. Murray attests that as Executive Director of Clinical Services, Chief Physician Executive for UTMB's Correctional Managed Care, he does not treat patients or maintain a clinical practice. (Docket Entry No.51-3, page 3).   Murray further attests that he does not make decisions regarding the care or treatment of particular offenders and he has not met or treated plaintiff nor participated in any decisions regarding his care.  (*Id.*).  Plaintiff presents nothing to contravene Murray's affidavit; therefore, he fails to show that Dr. Murray was personally involved in the delay or denial of his medical care.

Plaintiff claims that Dr. Jahadi refused P.A. Bouton's request to refer plaintiff to the orthopedic clinic in Galveston because plaintiff did not meet the criteria for such referral.  Dr. Jahadi attests that he was employed from 1998 to 2007, as a medical director for UTMB. (Docket Entry No.51-4, page 2).   Dr. Jahadi attests that he conducts utilization review of hundreds of requests for specialty treatment for TDCJ offenders each month but he does not see

12

the offender and does not get involved in their medical care. (*Id.*, page 3). Instead, Jahadi receives information via computer regarding requests for referrals to specialists in the same way as health-care providers in the private sector. (*Id.*). He indicates that if the information is inadequate to make a decision he requests additional information. (*Id.*). Jahadi does not recall whether he conducted a utilization review regarding plaintiff's request for a referral to an orthopedist and that if he did, he based such decision on his medical judgment. (*Id.*). Jahadi notes that plaintiff did not appeal his decision even though a mechanism to do so is available. (*Id.*). Plaintiff presents nothing to contravene Jahadi's attestation that he was not personally involved in denying or delaying medical care to plaintiff. To the extent that Jahadi denied such request without the full record, as P.A. Jung surmised, such action does not constitute deliberate indifference.

Plaintiff claims that he wrote to Joe Butler from UTMB asking him to help because he is able to speak with doctors to correct a mistake but Butler did not respond to his pleas for appropriate medical care. Other than Butler's failure to respond to letters, plaintiff states no facts to show that Butler was personally involved in plaintiff's medical care.

Likewise, plaintiff's pleadings do not show that Lt. Day was personally involved in plaintiff's medical care or in assigning a particular job to plaintiff in the field. Plaintiff complains of the inaccuracy of Day's report to Warden Negbenebor about the work assigned to inmates in the utility 4 squad, which Negbenebor included in his response to plaintiff's Step 1 Grievance.[3] Plaintiff complains about the inaccuracy of Day's report in his Step 2 grievance but

---

[3] The English translation of plaintiff's claim against Day is as follows: "T. Day who works for T.D.C.J. at Ramsey 2/Stringfellow in his official capacity. He took the liberty and intentionally against my medical needs, knowing that I am injured of my shoulder and muscle and nerves." (Docket Entry No.14-1, page 1). Plaintiff also alleged, the following, in pertinent part:

he did not voice any other complaint about Day.  (Docket Entries No.14, page 14; No.14-1, page 6; No.51-2, page 11; No.52, page 15).  Day attests that he does not remember plaintiff very well and that he does not think that he worked under his supervision for very long.  (Docket Entry No.51-3, page 4).

Plaintiff has not alleged an Eighth Amendment violation against Lt. Day and his complaint about Day's response in the Step 2 Grievance is subject to dismissal.  An inmate does not have a constitutionally protected liberty interest in having grievances or complaints resolved to his satisfaction. *See Geiger v. Jowers*, 404 F.3d 371, 373-74 (5th Cir. 2005).

Because the uncontravened record shows that defendants Murray, Jahadi, Butler, and Day were not personally involved in plaintiff's medical care or his job assignment, these defendants are entitled to summary judgment on plaintiff's Eighth Amendment claims against them.

## 2. Qualified Immunity

Qualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" *Saucier v. Katz*, 533 U.S. 194, 199-200 (2001) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)), *overruled in part by Pearson v. Callahan*, 129 S.Ct. 808, 813 (2009). Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  When a defendant invokes qualified immunity, the burden is on the plaintiff to demonstrate the inapplicability of

---

Lt. T. Day:  this man responded to my grievances saying that I am all right in the fields and that the trailers have steps, which they do.  But first you have to step on a pipe, and then you have to exert the arms in order to step on the steps.  And that I should not lift heavy bags.  But he did not answer about the hoe.  I have to lift my arm up and down and hit the ground with force and cut branches which are very hard.  All of these movements are the ones that cause me pain and injure my shoulder.  Besides, how can an educated person like him, answer in that manner, when I have restrictions.

(*Id.*, page 2).

the defense. *McClendon v. City of Columbia*, 305 F.3d 314, 322 (5th Cir. 2002). Even so, on summary judgment, the court must look to the evidence before it in the light most favorable to the plaintiff when conducting a qualified immunity inquiry. *Id.* at 323.

"To rebut the qualified immunity defense, the plaintiff must show: (1) that he has alleged a violation of a clearly established constitutional right, and (2) that the defendant's conduct was objectively unreasonable in light of clearly established law at the time of the incident." *Waltman v. Payne*, 535 F.3d 342, 346 (5th Cir. 2008) (footnote omitted). The Court has discretion "in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 129 S.Ct. at 818. If plaintiff fails to rebut either prong, the Court's analysis ends. *See Freeman v. Gore*, 483 F.3d 404, 410-11 (5th Cir. 2007).

### a. Medical Care

Defendants contend that plaintiff cannot defeat Dr. Dumas's and P.A. Bouton's qualified immunity defense because he fails to demonstrate an Eighth Amendment violation. The Eighth Amendment prohibition against cruel and unusual punishment forbids deliberate indifference to the serious medical needs of prisoners. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). The standard to show deliberate indifference, however, is extremely high. *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006). For a prison official to be liable for deliberate indifference, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

15

Deliberate indifference is especially difficult to show when the inmate has been provided with ongoing medical treatment.  "Unsuccessful medical treatment, acts of negligence, or medical malpractice do not constitute deliberate indifference, nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances."  *Gobert*, 463 F.3d at 346 (citations omitted).  Dr. Dumas and P.A. Bouton contend that they were not deliberately indifferent to plaintiff's serious medical needs because they examined and treated plaintiff. (Docket Entry No.51, page 17).

### 1. P.A. Bouton

Although plaintiff claims that P.A. Bouton was deliberately indifferent to his serious shoulder injury, the record reflects otherwise.  Numerous times Bouton examined plaintiff and prescribed pain medication, warm moist soaks, and stretching exercises; on one occasion, he ordered two-day lay-in.  Bouton also ordered x-rays and requested an orthopedic consultation, which was denied.  Although plaintiff claims that an interpreter told him that Bouton had changed a medical restriction that plaintiff had when he was transferred to the Unit, the record shows that plaintiff did not have any medical restrictions on his HSM-18 when he arrived at the Stringfellow Unit.  (Docket Entry No.51-7, pages 3-5).  The record does not show that Bouton removed any of plaintiff's medical restrictions.

In fact, the record is void of evidence that Bouton refused to treat plaintiff, "ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."  *Domino v. Texas Dep't of Crim. Justice*, 239 F.3d 752, 756 (2001) (internal quotation omitted).  Likewise, the record does not show that Bouton engaged in any act that evinces "obduracy and wantonness."  *Bradley v. Puckett*, 157 F.3d 1022, 1025 (5th Cir. 1998).  Bouton provided care and treatment to

16

plaintiff and attempted to obtain an orthopedic screening.   Plaintiff's dissatisfaction with Bouton's medical treatment "does not mean that he suffered deliberate indifference."   *Norton v. Dimazana*, 122 F.3d 286, 291-92 (5th Cir. 1997).

### 2. Dr. Natascha Dumas

Plaintiff complains that Dr. Dumas did not do what she promised to do, *i.e.*, send him to UTMB, change his restrictions, and take him out of the fields.   Instead, he complains, he received a copy of the new restrictions and a new job on the utility squad where he engaged in field work.

On May 30, 2006, after Bouton's referral to the orthopedic clinic had been denied, Dr. Dumas examined plaintiff and noted that he had been seen in 2004 by an orthopedist, and that surgery on the shoulder had been cancelled.   (Docket Entry No.51-5, page 19).   She made specific observations and noted that plaintiff suffered a "possible impingement, no muscular atrophy."   (*Id*.).   Her assessment was a "left rtc tear vs. impingement."   (*Id*.).   Dr. Dumas also noted that a referral to the orthopedic clinic had been denied. (*Id*.).   Dr. Dumas issued work restrictions and prescribed prednisone.   (*Id*.).   She did not, however, have a copy of plaintiff's 2004 medical records from UTMB.   (Docket Entry No.51-2, page 20).

In mid-September 2006, Dr. Dumas examined plaintiff again for complaints of shoulder pain.   (Docket Entry No.51-5, page 27).   Dumas noted that plaintiff had a full range of motion of his shoulder and some tenderness along the left scapula and shoulder muscles.   (*Id.*). She noted that plaintiff had been seen by an orthopedist in 2004 and that surgery was not warranted.   (*Id*.).   She made no changes in his work restrictions and did not indicate the need for an orthopedic referral.   (*Id.*).   She ordered a follow-up office visit for his shoulder disorder.   (*Id.*).

17

Although Dr. Dumas could have ordered plaintiff's UTMB medical records given her knowledge that he had seen an orthopedist in 2004, such failure does not constitute deliberate indifference to his serious medical needs.  "[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment."  *Farmer*, 511 U.S. at 837-38; *see also Lawson v. Dallas County*, 286 F.3d 257, 262-63 (5th Cir. 2002) (holding that "[d]eliberate indifference cannot be inferred from a prison official's mere failure to act reasonably, *i.e.*, it cannot be inferred from negligence alone").  Likewise, Dr. Dumas could have re-submitted the request for an orthopedic referral.  However, complaints that more treatment should have been ordered, without more, are insufficient to show deliberate indifference because "the decision whether to provide additional treatment is a classic example of a matter for medical judgment." *Domino*, 239 F.3d at 756 (internal quotation omitted).  Dr. Dumas provided treatment for a possible shoulder injury by prescribing strong medication and ordering specific medical restrictions.   Therefore, even if she knew that plaintiff had a shoulder injury that posed a substantial risk to his health or safety, she responded reasonably to the risk, and should incur no liability under § 1983.  *See Farmer*. 511 U.S. at 844.

Plaintiff presents nothing to contravene this record and fails to rebut defendants Bouton's and Dumas's affirmative defense of qualified immunity by showing the existence of a material fact issue regarding deliberate indifference.   Accordingly, defendants are entitled to summary judgment on plaintiff's claims against Bouton and Dumas.

<u>b. Job Assignment</u>

Plaintiff claims his job assignments on the Stringfellow Unit violated his medical restrictions.  Plaintiff claims that when he arrived at the Stringfellow Unit in February 2006, his

18

interpreter, CO4 A. Lopez, told him that Warden Negbenebor was putting him to work in the fields; plaintiff told Lopez that he had medical restrictions and an injured shoulder that was scheduled for surgery. (Docket Entry No.52, pages 8-9). Plaintiff claims that Lopez told him that Negbenebor said that plaintiff had medical restrictions but he was going to recommend that Bouton remove them so that plaintiff could work in the fields. (Docket Entries No.1-1, page 6; No.52, pages 8-9). Plaintiff complained in Step 1 Grievance No.2006197492 that Bouton removed his restrictions because Warden Negbenebor and Classification Chief Dickerson needed workers. (Docket Entry No.51-2, page 12).

Plaintiff also claims that after Dr. Dumas gave him medical restrictions in May, 2006, he was assigned to the utility squad 4, where he continued to perform the same field work except that he got a fifteen minute break. (Docket Entry No.1-1, page 8). Plaintiff complains that he still carried sacks of vegetables, mowed the grass with a hoe, and cut off branches, which caused him to hurt from the waist up. (*Id.*). Plaintiff states that he wrote to Classification Chief Dickerson and Dickerson responded that plaintiff was all right, there was nothing wrong with him, and that he was where he should be. (*Id.*). Plaintiff continued to work in spite of the pain. (*Id.*).

Defendants contend that Negbenebor and Dickerson are entitled to qualified immunity because plaintiff's job assignments did not violate his medical restrictions. (Docket Entry No.51, page 21).

"[P]rison work requirements which compel inmates to perform physical labor which is beyond their strength, endangers their lives, or causes undue pain constitutes cruel and unusual punishment." *Howard v. King,* 707 F.2d 215, 219 (5th Cir. 1983). If a prison official knowingly assigns an inmate to a job he or she realizes may significantly aggravate a serious

19

physical ailment, then such a decision would constitute deliberate indifference to serious medical needs that may violate the Eighth Amendment's prohibition against cruel and unusual punishment. *Jackson v. Cain*, 864 F.2d 1235, 1246 (5th Cir. 1989); *see also Calhoun v. Hargrove*, 312 F.3d 730, 734-35 (5th Cir. 2002) (finding claim sufficient to survive a motion to dismiss where prison official purportedly knew about a four hour medical work restriction but forced inmate to work long hours, which raised blood pressure to dangerously high levels). A negligent assignment to work that is beyond the prisoner's physical abilities, however, is not unconstitutional. *Jackson*, 864 F.2d at 1246. Moreover, a mere disagreement about a work assignment does not amount to deliberate indifference. *See e.g. Douglas v. McCasland*, 194 Fed. Appx. 192 (5th Cir. 2006) (finding claim frivolous where plaintiff fails to show that defendants knowingly assigned him work that would significantly aggravate his medical condition); *Freeman v. Alford*, 48 F.3d 530 (5th Cir. 1995) (not designated for publication). Moreover, to succeed on a civil rights claim, plaintiff must show that his job assignment significantly aggravated a serious physical ailment. *Jackson*, 864 F.2d at 1246-47.

The record does not show that Warden Negbenebor and Classification Chief Dickerson initially assigned plaintiff to the unit field squad in violation of his medical restrictions because they needed workers.[4] The undisputed record shows that plaintiff had no work restrictions on his HSM-18 when he arrived on the Stringfellow Unit on February 10, 2006; therefore, his assignment to an agricultural job and later to the hoe squad did not violate any medical restriction. (Docket Entries No.51-7, pages 3-5; No.51-10, page 8). Plaintiff

---

[4] The record shows that the Stringfellow Unit houses over 1,200 offenders and there is no shortage of offender labor. (Docket Entries No.51-11, pages 3-4; No.51-12, pages 3-4). All TDCJ offenders are required to work, even those with medical restrictions, unless they are medically unassigned, which means that they are unable to perform any job at all. (*Id.*).

acknowledges that a field supervisor told him the same when he first complained about the work in the field.  (Docket Entry No. 1-1, page 6).

Plaintiff also complains that Negbenebor and Dickerson violated his medical restrictions by assigning him to the utility 4 squad after Dr. Dumas diagnosed him in late May 2006, with a possible shoulder injury and placed medical restrictions on his work assignment of no climbing, no lifting anything over twenty pounds, and no work above the shoulder.  Plaintiff claims that he was still required to perform the same field work on the utility squad, except that he got fifteen-minute breaks.  (Docket Entry No.1-1, page 8).  He complains in his amended pleading the tasks on the utility squad 4 violated his medical restrictions and caused him great pain because he still had to raise his arms overhead to step onto the trailer and that he still had to weed the grass with a hoe and to cut branches.  (Docket Entry No.14-1, page 2).

Negbenebor and Dickerson attest that plaintiff was appropriately assigned to the utility field squad per his medical restrictions because there were a number of jobs within that assignment that he would have been able to perform.  (Docket Entries No.51-11, page 3; No.51-12, pages 3-4).  They both attest to the pace of work and specific jobs that offenders might be required to perform in the utility squad such as cutting grass and weeds with a hoe and helping to harvest vegetables.  (*Id.*).  Both attest that medically restricted offenders are not permitted to carry sacks of harvested produce.  (*Id.*).

Lt. Day, who supervises approximately 100 inmates assigned to the field squad, attests that a field supervisor receives daily a roster of all inmates assigned to the field squad, which consists of a thumbnail sketch of each offender and the offender's medical restrictions, escape risk, and other information necessary for safety and security of the inmates, from which he assigns specific jobs.  (Docket Entry No.51-13, page 3).  Day further attests that about one-

21

third of the inmates assigned to him have medical restrictions, including the same restrictions as plaintiff. (*Id.*). Day attests that he does not assign or remove restrictions but works the offenders within the restrictions assigned by the medical department. (*Id.*). Day further attests that he usually assigns inmates with medical restrictions to utility squad 4, which is a medical squad. (*Id.*). TDCJ-CID policies and relevant Offender Job Descriptions support defendants' attestations.[5] (Docket Entries No.52-8, No.52-9; No.51-9, page 9).

Plaintiff claims, however, that the field work he was required to perform when he first arrived on the Stringfellow Unit in mid-February 2006, exacerbated his pre-existing shoulder injury; therefore, when he was assigned to the utility squad 4 in June 2006, and was required to do tasks similar to those on the field squad, such as weeding with the hoe, he continued to injure his shoulder and to suffer extreme pain. (Docket Entry No.52, pages 13-15). Furthermore, plaintiff claims that not all the restrictions on the utility squad 4 were enforced. Plaintiff, however, does not identify the TDCJ supervisor or supervisors who forced him to work beyond his medical restrictions while on the utility squad 4. Likewise, plaintiff states no facts and presents no evidence to show that TDCJ administrators Negbenebor and Dickerson assigned him to the utility squad 4 with knowledge that his shoulder injury would be worsened by the work he was required to perform.

Warden Negbenebor attests that he strongly believes, "based on many years managing prison health operations and prison units, that there is never a time when an offender's health and safety should be compromised for a prison job. Despite what Mr. Santoyo may believe, TDCJ has no interest in causing harm to offenders and every interest in making sure

---

[5] The Offender Job Description of the utility squad requires performance of duties such as pulling grass, picking up small rocks, and other assigned light duties, weeding and raking of cut grass, brush clearing, digging ditches, cutting wood, painting, or outside cleaning of buildings, subject to the offender's HSM-18 job restrictions. (Docket Entry No.51-9, page 9).

they leave prison no worse off than they were when they came in."  (Docket Entry No.51-11, page 4).

Plaintiff does not dispute Negbenebor's attestation but questions whether defendant Dickerson knew that the work assigned to him was beyond his capacity to do.  As evidence, plaintiff claims that Dickerson knew of his shoulder surgery in March 2007, but assigned him to the laundry on May 30, 2007, which caused him to reinjure his shoulder. (Docket Entry No.52, page 12).  The record, however, shows at the time plaintiff was assigned to the laundry, his only restrictions were no climbing, no reaching over shoulder, and no lifting more than twenty pounds.  (Docket Entry No.38-4, page 10).  Plaintiff states no facts and presents no evidence that folding laundry would violate these restrictions or that Dickerson had any way to know beyond the medical restrictions on the HSM-18 that the movements required to fold laundry would cause re-injury.  The record shows that restrictions such as no repetitive hand use and no lifting more than 5 pounds, which would preclude folding laundry (Docket Entry No.51-9, page 8), were added to plaintiff's HSM-18 on June 13 and 20, 2007.  (Docket Entry No. 38-4, pages 15, 17).

Considering the entire record, pleadings, and the applicable law, the Court finds no evidence that plaintiff suffered an Eighth Amendment violation.  Instead, the record shows that plaintiff suffered further injury to his shoulder and months of pain because of an institutional failure to make his entire medical record readily accessible to UTMB providers at the Stringfellow Unit, and because of the negligence of some medical providers to follow up on his medical history.  Such institutional failure and individual negligence led to no or few restrictions on his HSM-18, upon which TDCJ administrators relied when they assigned plaintiff to perform work that worsened his injury.

23

Because the record does not show that plaintiff's constitutional rights were violated, and plaintiff has not presented evidence giving rise to a fact issue with respect to the same, defendants are entitled to summary judgment on their qualified immunity defense.

## IV. CONCLUSION

Finding no violation of any federal constitutional right or federal statute in plaintiff's pleadings, the Court ENTERS the following ORDERS:

1.  Defendants' motion for summary judgment (Docket Entry No.51) is GRANTED.  All claims against all defendants are DENIED and this complaint is DISMISSED WITH PREJUDICE.

2.  All pending motions are DENIED as moot.

The Clerk shall provide a copy of this Order to the parties.

SIGNED at Houston, Texas, this 2nd day of March, 2010.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE

24